The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. First case for argument this morning is 20-1074, Amgen v. Sanofi. Mr. Lamkin, whenever you're ready to proceed. Thank you, Chief Judge Prost, and may it please the Court. I'd like to make three points on enablement, each grounded in evidence the jury was entitled to credit and is presumed to have credited. First, the patent's roadmap produces the antibodies within the claims. The two anchor antibodies, two brand new antibodies created by the inventors, together stand... Mr. Lamkin, this is Judge Lorry. These are composition of matter claims, and they're not claimed by structure. They're claimed by function, and they require two functions to meet the enablement test. This is like a double enablement test, a super enablement test. And district court found that there was no testimony that a structure-function relationship would eliminate the need for testing new antibodies to determine whether they had the functions of blocking and binding. And the court also found that it would take a substantial amount of time and effort to meet the enablement test for these broad claims. Now, that sounds like undue experimentation, and that's the key factor in enablement. So you've got a pretty uphill battle. So let me start with whether or not we have purely functional claims here. I think that first, we have the structure in that we have a monoclonal antibody, and we also have a function which is blocking. The fact that they bind to a particular region, as Dr. Petsko explained, that binding means that they have to have the three-dimensional structure and the electrochemical complementarity. That's the structure in order to bind. As Dr. Petsko explained... But the claim doesn't define structure. The claim defines function. Well, certainly the function is blocking. And as Dr. Petsko explained, the binding to the sweet spot is in having the electrochemical complementarity. And the three-dimensional structure, to be able to bind to the sweet spot, is a structure that gives you that function of blocking. But I don't think that really should matter, because ultimately what the question is, can you make each of the approximately 400 distinct antibodies without undue experimentation? And there's two things that I'd want to talk about with respect to that. The first is the roadmap. And the roadmap is using, for example, a mouse and the two anchor antibodies. These are two brand-new antibodies created by the inventors that together span the full area above PCSK9 sweet spot. That's at appendix 171. You look at figure 28 there. It has 331H4 on the left and 21B12 on the right. And as a result, because those two cover the entire sweet spot, skilled artisans can use them to identify all of the utmost 400 distinct antibodies that bind anywhere on that sweet spot. And the record shows that when you injected the mice and super-immunized the mice, we used a panel of 20, you got about 3,000 antibodies that bound to PCSK9 anywhere. And it was very simple using those two anchor antibodies to filter out the most 400 that bind to the sweet spot. The evidence showed it was a cost of less than $300. That's at appendix page 3909. So when it comes to the basic roadmap for making these, the use of basic antibody science, super-immunized mice, those two anchor antibodies, this is actually the opposite of cases like adenics where the artisans are asked to find a few small molecules that treat HCV from likely millions or at least tens of thousands of listed possibilities with no guidance except individually synthesized each, test each for activity. That sort of specification is more like a trial-and-error research plan to hunt for a few needles that work and a haystack of ones that do not. But here you have the standard tools of antibody science, like immunized mice, that reliably generate the full spectrum of claimed antibodies. And Dr. Reese explained that, look, if you do the super-immunization, you will be certain to make all the claims antibodies, including the defendant's examples. And that's at appendix 3909. And at appendix 3904, that super-immunization protocol continually boosts response to obtain a full spectrum of antibodies. That produces about 3,000 antibodies that bind someone on PCSK9, and then you can whittle it down without undue experimentation to come up with the 400 or so that bind to the sweet spot. So I don't think in terms of the roadmap, there's any real question on this record that it is fully enabled. In fact, Wands ruled that filtering antibodies down to those with the desired characteristics was not undue experimentation 40 years ago. The jury was allowed to reach the same conclusion now and certainly wasn't required to accept the contrary as proven by clear and convincing evidence. I think that when the district court was talking about millions or difficulty of coming up with them all, there were two things going on there. First, the court credited Sanofi Regeneron's speculation that, quote, you could be immunizing mice for 100 years, but there might be some kind of antibody that you didn't come up with in that time period. But that can't be enough for JMOL. The council district court said, neither does the patent provide any direction or guidance on how to predict whether an antibody will bind. I think the answer to that is you can predict that, and the evidence showed that if it's going to bind to the sweet spot, it will block. And the way antibody scientists, when you're looking at predictability, you don't look at sequence. The way antibody scientists do predictability is they simply do their assays. And once they come up with the 400 or so that bind to it, you know they will block. And Dr. Pesco explained, if an antibody has the structure that allows it to bind to one of the residues, it will block. And the specification here tells you exactly how to make those 400 by immunizing the mice and using the two anchor antibodies, which cover the full sweet spot, to find each of the approximately 400 distinct antibodies. Do you not agree that there are two functions that have to be met to enable these claims? So to be within the claims, I think the answer is it would have to bind to the sweet spot. We view that as structural because you have to have the three-dimensional structure that you can sort of visualize in order to match the unusual shape of the sweet spot and the electrochemical complementarity. But if you want to call that functional, that's fine. And that would achieve one way of achieving the function of blocking the interaction between PCS canine and LDL receptors. But when it comes to enablement, it really shouldn't matter because these standard tools produce the approximately 400 distinct antibodies that will bind to the sweet spot and will thereby block the interaction. And whether or not you actually produce them using the mice or the other mechanisms established through the roadmap is a factual question. And there is evidence there from which the jury could find that, yes, you will produce each and every one. Dr. Rhee specifically so testified that you will get every one of those distinct ones following the roadmap. And I think the only argument on the other side for the roadmap... Mr. Lampkin, I'm sorry, time is short. So let me just interrupt, and maybe you were getting to the answer to my question, which is there's a very helpful chart, in my view, on JA4283, which is at the red brief at 52. And the question here, as we've all recognized, is whether or not the roadmap... has predictability with respect to the full scope of the antibodies. And as this chart seems to show, and I don't think anybody is rebutting it or disputing it, none of the examples of your example antibodies bind three of those specifically claimed sweet spot residues, which are shown in the left-hand column. And none of your examples bind more than nine of the sweet spot residues, but you've claimed a range from two bound to the full set of 15 or 16, depending on the claim. So I guess I'm having trouble seeing where your roadmap and your examples get you to enablement of the full scope of the claims, which would also include the competitor antibodies, which seem to me substantially different. Right. Well, there was no evidence that the competitor antibodies weren't in Amgen's 384 that were produced within the 3,000. These are simply the one... These are 10 of the 26 representative antibodies that were fully characterized for which we gave sequence and other information in the patent. There's no evidence whatsoever that the 384 didn't include things like these competitor antibodies. But even setting that aside, the testimony was that it would produce each and every one of them, and the jury was unable to credit that. And look, they didn't even ask. Sanofi Regeneron didn't even ask for the 384 examples that were produced by our roadmap in order to show, gee, there might be something missing here. It's very hard for the jury to say, look, you're missing something from this 384. Your roadmap doesn't produce it. When the other side didn't even characterize them and say, look, there's something missing here. Is there any truth to the notion that, gee, these aren't going to come out of the roadmap? You think that they would... And Dr. Reese testified and walked right through each of these, and that's about page 3804, I believe. He actually walked through each of the competitor antibodies and explained in detail why the roadmap would produce each and every one of those, and the jury was able to allow to credit that. In terms of the differences, this difference is simply in fact one, that you've only got 10 of our 26 antibodies here. But if you look at the Amgen antibodies, they bind to a variety of places, a variety of different places to bind to, covering a full diversity of... Can I interrupt you for a second? This is what you said about 30 seconds ago. I'm not seeing where there's evidence that the 384 antibodies did include the competitors and no evidence of what they were at all beyond the 26 examples. Can you point me to that? So, well, it was not our burden to show that they were all there. But I thought you would say... Page 3908, other transcripts, and he goes through three transcript pages there, and he walks through the progulant alericumab and explains why that would be produced by the roadmap. He then walks through 1D05 and J16, each of those, and explains why those would be produced using the roadmap. And that is evidence... We can quibble now, and it's not probably the place to discuss how conclusory that testimony is. But that witness didn't address, for instance, the fact that these have different functional properties or how long it would take or any of those matters, right? That testimony that you referred to at 3908, et cetera. So, first, I think the evidence was undisputed that they wouldn't have any different functional correlation. Sanofi Regeneron's own witness, Dr. Eck, admitted that it doesn't matter how many residues they bind to or where those residues are in the sweet spot. It does not have any bearing. That's at Appendix 3887. There's no correlation between the number of amino acids that are bound and the blocking. That's Sanofi Regeneron's own witness. And so when Dr. Reese or Dr. Petsko was explaining whether you would consider these part of the same class, he explained that given that there's no functional difference between binding to 2 and binding to 7 or binding to 9, no one would consider, an antibody scientist, would not consider these competitor antibodies to be part of a distinct or different class. He was directly asked, if Amgen has one that binds to 9, would you consider that a different class from the competitor antibodies that bind to maybe 9, 11, 12, 13? And he said no, because it just doesn't make a difference in terms of their ability to bind. If you bind to the sweet spot, you will block. I see that I'm... Yeah, we'll reserve your rebuttal, and let's hear from Mr. Wolfe. Thank you. Thank you, Your Honor. May it please the Court. I'd like to start, if I may, with this number 400, which we heard no fewer than six or eight times in counsel's oratory. You may have noticed that that number did not appear in the district court's opinion, and that's because that number was never presented to the jury or the court. To the contrary, we asked, and this is at A3869, we asked the lead inventor, how many species, if you do the roadmap, how many would successfully accomplish the claim function? His answer, quote, I don't know a specific number. We then asked their expert, Dr. Reese, same question, this is at 3902, I can't give you a number on what the total is. We have no idea how many candidates other companies, universities, other countries came up with and didn't publish or didn't follow or how many others would come up with if they had an incentive to keep trying. This number 400 is not in the record. It's not supported by the patent. Moving on to the issue of predictability, which is really, I think, as Judge Lori noted, the heart of this. There's no real dispute that you would have to test each of the millions of possible candidates for their function, Dr. Pesco, at A3891. Changing a single amino acid can change the function and you would need to test to see if it maintained the function after that single amino acid change. Dr. Reese, there are... Mr. Wolf, enablement should be easier than written description. And written description has been found, in this case, to have been satisfied. And the district court said the methods involved here were routine and well-known and there was no dispute concerning the guidance presented on making 26 examples. So why hasn't enablement been met just as written description was? Your Honor, well, as you know, we believe that the written description opinion was erroneous and we can talk about that in a moment, if you'd like. But under Wyeth and IDENIX and ENZO, it is plain that if you have a functional limitation, and in this case we don't merely have a functional limitation, we have a purely functional claim, that if you have a functional limitation, you have an enormous number of candidates, and here the candidates are many millions, in fact, astronomical if you follow the rules of the patent, and you'd have to test each and every one, well, that is a classic example of undue experimentation. So the fact that, and I believe the district court used the analogy of gold in California hills during the gold rush, the fact that you knew that there were gold in the hills and that you knew how to use a pan to find it doesn't mean you were entitled to every ounce of gold on every square mile of the California countryside. That's really what we have here. Mr. Wolf, this is Judge Hughes. Can I just interrupt you? Yes, sir. I understand your argument, and I understand your reliance on Wyeth and ENZO in these new cases. I find it very hard to distinguish this case from Wands, but I also find it very hard to reconcile Wands with ENZO and Wyeth in those cases. Can you help me? Absolutely, Your Honor, and to use the analogy that counsel used  that Wands was looking for hay in a haystack, the procedural and factual posture of Wands was quite distinct. At 740 of Wands, the court noted, quote, no evidence was presented by either party on how many hybridomas would be viewed by those in the art as requiring undue experimentation to screen. Of course, that was the entire substance of this trial was the number of candidates, how hard it would be to screen, what the predictability was. So the central issue in this case was not an issue at Wands at all, and that's not surprising because the hit rate in Wands, where here it's millions and millions would be tested to find a few, the hit rate in Wands was 4 out of 9. It was a 50-50 roughly hit rate. So Wands was a different factual issue. It was a different legal issue, and frankly, the full scope analysis done in this case simply wasn't in play in Wands. Well, can I just ask you a little bit about that? Because I'm still a little confused about why the number of experiments matters if the experiments themselves and the methods to be used are predictable. And maybe I'm just not understanding the facts here. Clearly, I am not an expert in this area, and the science is hard, but it seems to me that we have a pretty detailed roadmap on what you have to do to either through the RAT way of doing it or through the conservative substitution way of doing it to come up with different antibodies, and then you just run kind of conventional tests to determine whether they bind or not and how well they work. Why is the fact that you might have to do that a million times versus, you know, a hundred times, as long as qualitatively it's not difficult, undo experimentation? A couple observations on that, Your Honor, if I may. First, it was important that the district court noted, and this is at 823, that the roadmap that we heard so much about in the papers and in counsel's presentation would have required, does require essentially the same amount of work as the original work. I mean, step two of the roadmap is just go out and generate antibodies and screen to see if they perform the function. Well, that's what they were doing originally. Dr. Reese, their expert, as to the quantity of experimentation, which is, of course, the fundamental question here, said that analyzing those millions and millions of antibodies to see whether they worked, testing them, would be, quote, an enormous amount of work, end quote, and more than any scientist would even contemplate doing. That's at A3914. I can't think of, and this is, of course, their expert, a better definition of undue experimentation than more work than any scientist would even contemplate doing. So that's really focusing. I get that argument. Can I just follow up with one last question then? Yes, sure. Thinking about this in larger terms of, you know, claiming a genus in terms of a functional claim like we have here, it seems to me that the logic that you're proposing and that we would have to find, then, is that essentially there's no way to claim a large genus of a functional claim if the only way to figure it out is through running every single instance through very routine experiments and very predictable results. Is that correct? I mean, how would you claim this genus of antibodies any other way? Well, Your Honor, the primary way you claim a genus in any field is by structure, not by function. And, of course, we can get to the Halliburton case. But that's what I'm asking about, and I don't know the answer to this. I think our precedent is not altogether clear on this. Is it basically, I mean, is it so difficult to claim it functionally because it's always going to result in undue experimentation that it's just not permissible to claim a genus functionally, that it should be claimed by structure? I'm not sure as a factual matter I would go that far, Your Honor, particularly as the science evolves. We all read in the paper in the last two weeks that the protein folding problem, at least by one account, had been solved. So there may be a fact pattern and there may come a time where function dictates structure sufficiently, that it is predictable, and therefore defining a structure, excuse me, defining a function, gives you enough of an idea of the structure, enough of the predictability of the structure, that it would cross the threshold of enablement and written description. But we're clearly not there in this set of facts in this case. I mean, when you have their own experts and Dr. Malin, their inventor, saying the only way you know, even with a single amino acid change, is to test it, and that's at A3768. And that was specifically about conservative substitutions. When those are the facts of this case, it is difficult to envision how a functional claim could possibly be valid under, again, the circumstances of this particular body of antibody science. Dr. Wolf, is the fact that these claims have two functions in them important to your argument?  I think it is further reason why they are not enabled, but either one of them, you have to test for binding, you have to test for blocking. So, yes, it is doubly problematic for the plaintiff in this case, for Amgen, but either one of them would be more than sufficient to justify upholding the district court's opinion. If I may, are there any other questions the court has on the enablement issue? Well, that's the main issue, right? Right. I just wanted to touch briefly on written description, Your Honor. Mr. Wolf, this is Judge Prouts. Can I just ask kind of a follow-up question to what we've been discussing on enablement? Yes, Your Honor. Is there only 3D structure for the two-anchor antibiotic bindings and no data beyond that? That's correct, Your Honor. It would amount to less than half of the sweet spot residues that are articulated, right? That's absolutely correct, Your Honor. And moreover, there was no analysis below. I mean, Dr. Pesco acknowledged, and this is at 3878, that as far as he knew, each of the 26 disclosed antibodies have, quote, different kinds of fits, quote, bind to different parts of the sweet spot, quote, come in at different orientations. So there was no commonality among those two 3D structures to the rest. It was admitted that there was not – it's not like you could say, ah, I can visualize, I can see that structure, and I know if it's repeated, it will bind or it will not bind, what is in or out. Your point is right, and it goes beyond that, Your Honor. If I may then, very briefly, on written description, I'm sure I'm low on time. I should have started my timer. The one thing I wanted to note on written description is that the court, the district court found that it failed, or rather, it satisfied the representative species test for one reason and one reason only, and that was it found that one of the disclosed antibodies was 80 percent similar to one of the competitor antibodies. The problem with that finding is there wasn't a single expert on either side of the V that said 80 percent similarity tells us anything, because the difference between similarity and identity is length. I mean, I've been told I resemble one of the Denver Nuggets centers facially, but no one would say we're identical in any material way. I stink at basketball, and I'm not 7 foot 2. The test that everyone agreed to was 80 percent identity as the minimum threshold for finding representative species, and it was undisputed that there was not 80 percent identity between any of the disclosed antibodies in the patent and any of the competitor antibodies. Similarly, and perhaps even more importantly, it is undisputed that no antibodies disclosed in the patent are EGFA mimics or, as Your Honor mentioned previously, bind to more than nine residues. Amgen did not have EGFA mimics, yet they claimed them, and they claimed that they possessed them through the written description analysis, and they simply didn't. If you want to look at A9697, quote, we don't have any EGFA binders. Maybe those are the key to Pfizer's success. So the basis of the district court's finding, and this really goes to Judge Lurie's question about the relative thresholds, respectfully of the district court, the basis of its conclusion that written description test was satisfied is simply incorrect under the undisputed factual record. That was a facts question for the jury, which the district court affirmed. Yes, Your Honor, and we don't dispute that it's a different threshold. If it wasn't so clearly – I mean, I think, frankly, the district court just got confused on the difference between similarity and identity, and that is the only basis in the district court's opinion for its finding that the written description test was satisfied by Amgen. That is why I pointed out it was a simple misunderstanding of what all of the experts agreed was the appropriate test. That test was not even attempted to be satisfied by Amgen. So with that, Your Honor, unless you have further questions, I will give back the rest of my time. Thank you. We'll turn back to Mr. Lampkin and restore his four minutes of rebuttal that he reserved. Thank you, Your Honor. I would like to start with two items. The first is the roadmap, and then turn very quickly to conservative substitution, because that's where the supposed billions comes from. For the roadmap, if you look to the testimony cited on page 3902 from Dr. Ruiz, he actually walks through empirical experience on how many antibodies were found and explains that it's a small number. He comes up with closer to 100. We were generous and said 400. But the undisputed science is that given the shape and the small size of that sweet spot, you just wouldn't expect a large number of distinct antibodies to bind there. It's going to be a small number, which brings me to conservative substitution. And the critical thing about conservative substitution is that it starts with an antibody that's known to bind to the sweet spot and block PCS canine. For example, one of our 26 representative species, or the 400 you might get or so you might produce from the roadmap. And what you do is you replace selected amino acids identified in Table 1 with others that Table 1 identifies as being highly similar so that you don't disrupt binding, which is why it's conservative substitution. Even if you count the variants produced from that method as distinct embodiments, and there is ample reason the jury could have treated them as virtual carbon copies, if we had years of litigation and Sanofi Regeneron has failed to show a single example of a conservative substitution that resulted in a variant that didn't bind or block like the original, not one that broke the antibody and caused it to stop binding the sweet spot and thereby blocking PCS canine. The jury was entitled to clue that if there were more than a remote hypothetical possibility, Sanofi Regeneron, which had the burden of proof by clearing from its evidence, in the span of a decade would at least identify one example. That's why this is, again, sort of the exact opposite of identity. Mr. Lampkin, can I just interrupt? This is Judge Hughes. Since we're talking about conservative substitution, and I'm not sure I quite have my facts right, but the number kind of bandied about, at least in my head, was that that could result in up to a million combinations. I understand your arguments about how it's not really all that different, and so you shouldn't consider them that way. But let's just assume that that number is right and that you have to do the test on every single one of them to determine whether it binds and blocks or not. Why isn't that, particularly looking at Wyeth, why isn't that under experimentation under Wyeth? Well, we do think that millions is really exaggerated. If I understand the argument and the evidence, and if the jury could understand it, it was that you can't be certain that conservative substitution didn't break the end of the body without testing because you can always be surprised. I know with Dr. Meehan that he can be surprised. But the risk of an occasional dud doesn't defeat enablement. In any automated process, there's occasional failures. That doesn't mean those processes are not enabled. The risk of failure defeats enablement, whether so frequent or so pervasive, that it impedes the ability to make the invention. For example, converting it as an identix or Wyeth to a search for a needle in a haystack. We don't actually believe that the requirement for enablement is you have to be able to make seriatim every single conceivable embodiment within a period of time. But if you can make them, if you particularly produce them according to the method, that isn't even an experiment. It is production. And if you reliably make them, it's not undue experimentation. It's success. And that's why this is the precise opposite of identix. In identix, you expected each of those tens of thousands to fail, and you were searching for the one, the remote one that might work. Here, the patent makes absolutely clear, and the evidence showed, that you will succeed. If you look at page 211, column 27, line 63, it is known that certain amino acids can be substituted for other amino acids, having a similar hydropathic index, and still retain similar biologic activity. Phenoxy Regeneron's own patents say, in general, the concern of conservative amino acid substitution will not substantially change the functional properties of protein. It's only when you have failures that impede your ability to make and use the invention. They are so persuasive that they impede it, that you have undue experimentation. Being able to successfully make these products, successfully make them, isn't undue experimentation. It is production. This was, Wands found mouse-produced antibodies enabled, but the patent didn't disclose conservatism of the diffusion. It is something at the height of irony, to say that additional disclosure, teaching a prior art technique that was used since the 1980s, somehow defeats enablement. If I can return just very quickly, I know I'm well past my time, to the issue of written description. Written description here is a question of fact for the jury. The jury decides what's relevant, in terms of the features, and the jury decides that as a matter of fact. Dr. Pesco put up the models in a light box to show where you have hydrophobic, greasy patches, which need to line up, where you have charged and polar regions, which need to line up. He showed the complementary shapes you need, and the jury understood that the three-dimensional structures here were sufficiently similar from the 26 representative antibodies, or even the two anchor antibodies, and compared them to the competitor antibodies, and showed that that three-dimensional structure was sufficient for written description. Finally, on EGFA mimics, the document that Mr. Wolf was reading from, A969, was actually excluded by the district court, because it was going to mislead the jury, and because it doesn't say what Sanofi Regeneron was presenting as saying. If you take a look at the record, in particular, if you looked at 9529, it shows that when Amgen went to look and see what it had in its already existing panels, it actually had at least 20 middle binders. If you look at 9529, that's the missing epitope. The document, they kind of point to, oh, look, Amgen is missing an epitope. But if you switch two pages, one page, sorry, to 9530, it says, hybridoma panels used for re-screening effort. Five pre-existing hybridomas were replated to generate clonal hybridoma for screening. So Amgen just went back to the freezer and pulled out existing hybridoma pools. And what did they find? Page 9532. Right in the middle there is the A. This is your supposed missing epitope. Look at the lower right-hand corner of 9533, 20 epitope bin A1 antibodies. And these are ones that actually have the desired affinity. We aren't just looking for ones that bind there. One's with the desired affinity. And you look at 9534, 20 epitope bin A antibodies. So there's 20 that they found the moment they went and looked. The district court understood that that document that he was pointing to was going to mislead the jury because it didn't say, as Sotomayor was trying to say, that Amgen was trying to make these so-called EGFA mimics and failed. If you look at the documents, what we were trying to make, these middle binders, were actually there all the time. And the district court committed no abuse of discretion in excluding that document, and it's really not relevant for oral argument for these purposes. If the court has no questions, I really want to thank the court for its indulgence. Thank you. If there's no other questions, we ask for the court to reverse. I think we heard the entirety of the argument. I want to thank both counsel for their indulgence and the cases submitted. Thank you both.